STATE OF NORTH CAROLINA EX REL. DOROTHEA DIX HOSPITAL v. EARL WILLIAM DAVIS AND LEONARD MASSEY, GUARDIAN OF EARL WILLIAM DAVIS

No. 81

(Filed 7 March 1977)

1. Insane Persons § 5— mental patients — payment of costs of care — applicability to criminally insane

G.S. 143-117, providing that all persons admitted to Dorothea Dix Hospital are required to pay for the cost of their care, applies to any person confined to a State institution (as defined in that statute), regardless of the origin of the commitment; therefore, defendant, confined to Dorothea Dix Hospital as a mentally ill criminal, could be required to pay the actual cost of his care, treatment, training and maintenance while so confined.

2. Insane Persons § 5— defendant mentally incompetent to stand trial — hospitalization for defendant's benefit — costs charged to defendant

The State could collect from defendant the costs of his care and maintenance at Dorothea Dix Hospital during various periods between 18 March 1967, the date on which defendant was deemed mentally incompetent to stand trial, and 7 January 1972, the date on which defendant was transferred to Madison County for trial, since such confinement was essentially for the benefit of the defendant and not the public.

3. Insane Persons § 5; Constitutional Law § 20— criminally insane charged with cost of care — prisoners not charged with cost of confinement — no denial of equal protection

There was no constitutional impediment to the State's recovery of the actual cost of defendant's confinement and treatment at Dorothea

Dix Hospital from the date of his acquittal of the charge of murder by reason of insanity until the date on which defendant was found to be sane and no longer dangerous to himself or society, since defendant, acquitted by reason of insanity, was not a criminal and was not confined as punishment for the commission of a crime, and so requiring defendant to pay for his maintenance when prisoners were not required to do so did not deny defendant the equal protection of the law under the XIV Amendment to the U. S. Constitution.

**4. Insane Persons § 5— defendant determined sane — continued confinement — defendant charged with costs — no error**

Defendant's contention that his confinement in Dorothea Dix Hospital after a superior court judge found as a fact that defendant was sane and posed no danger to himself or society was illegal and that he therefore should not have to pay for the cost of his care and treatment at that institution subsequent to the judge's finding is without merit, since the judge found that defendant's illness was in remission, and it was for the trial judge to determine what relief was appropriate.

**5. Insane Persons § 5; Constitutional Law § 21— criminally insane defendant — cost of care charged to defendant — no deprivation of property without just compensation**

To require defendant, who was charged with murder but acquitted by reason of insanity, to pay the cost of his confinement to a mental health care facility in actuality would require him to pay for services rendered to and received by him, and would not amount to an unconstitutional deprivation of his property without just compensation.

**6. Taxation § 2— nonuniform taxation — tax defined**

A tax within the meaning of the constitutional prohibition against nonuniformity of taxation is a charge levied and collected as a contribution to the maintenance of the general government, and it is imposed upon the citizens in common at regularly recurring periods for the purpose of providing a continuous revenue.

**7. Insane Persons § 5; Taxation § 2— care of criminally insane — costs charged to insane person — no tax**

To require defendant, who was committed to a State mental health institution through the criminal justice system, to pay for the actual cost of his care, treatment and maintenance before and after his acquittal by reason of insanity did not subject defendant to an unequal tax to support the general welfare, since the charges in this case were not made for the support of the government, nor were they related to or limited by the necessities of government.

**8. Constitutional Law § 7— delegation of legislative power — prerequisites**

The General Assembly may not delegate its legislative authority to other departments of government or to subordinate administrative agencies; however, once the legislature has declared the policy to be adhered to by the administrative agency, the framework of the law to be followed, and the standards to be used in applying the law,

the authority to make factual determinations in applying the law may be delegated to an agency.

9. **Constitutional Law § 7; Insane Persons § 5— confinement of mentally ill — determination of costs charged to patients — no delegation of legislative power**

Statutes authorizing the board of trustees or directors of Dorothea Dix Hospital to charge patients of the hospital for the actual cost of their care, treatment, maintenance and training do not amount to the improper delegation of authority by the legislature, since the General Assembly has clearly stated its policy—that all those who are financially able shall pay for their maintenance; the only determinations to be made by the board of directors are of a factual nature—the "actual cost" of care and who is financially able to pay; and the statutes furnish sufficient guidelines to assist in these determinations. G.S. 143-118; G.S. 143-118.1; G.S. 143-120.

10. **Constitutional Law § 24; Insane Persons § 5— mental patient — payment of costs of care — due process**

Defendant who was required to pay the actual cost of his care and treatment at a State mental health care facility was not denied due process on the ground that he should have been entitled to an administrative hearing to challenge the determination of the hospital board as to the proper charge for his care and treatment, since defendant could have raised that issue and an issue as to his ability to pay in his answer to plaintiff's complaint, but he failed to do so.

ON petition for discretionary review, pursuant to G.S. 7A-31, of the decision of the Court of Appeals, reported in 27 N.C. App. 479, 219 S.E. 2d 660, which reversed summary judgment for defendant entered by *Godwin, J.*, on 30 December 1974. This case was docketed and argued as No. 49 at the Spring Term 1976.

Plaintiff, the State of North Carolina on behalf of Dorothea Dix Hospital, brought this action on 6 March 1974, pursuant to G.S. 143-121, to recover from Earl William Davis and his guardian, Leonard Massey, $21,005, the cost of maintaining defendant Davis in Dorothea Dix during various periods of confinement from 18 March 1967 to 30 November 1973. Defendant answered the allegations contained in plaintiff's complaint by denying liability and alleging that the statutes under which plaintiff was proceeding were unconstitutional.

Both parties moved for summary judgment. At the hearing on these motions, verified pleadings were introduced which tended to show that during 1966 defendant was charged in Madison County with the murder of his wife. On 13 January

1967, he was committed to Dorothea Dix for a psychiatric evaluation to determine his competency to stand trial. This commitment resulted in a finding that he was incompetent to stand trial. Thereafter, defendant was returned twice to Madison County for trial; however, on both occasions he was returned to Dorothea Dix prior to being tried. On 7 January 1972, defendant was returned to Madison County and was tried for the murder of his wife. He was found not guilty by reason of insanity. Because of evidence at trial tending to establish that defendant suffered from schizophrenia, paranoid type, at the time of the commission of the crime, defendant was committed to Dorothea Dix and remained there at least until 30 November 1973.

After considering the verified pleadings of both parties, the trial judge granted defendant's motion for summary judgment. This judgment was based upon a finding that the statutes under which plaintiff had proceeded were unconstitutional and therefore void. From this judgment, plaintiff appealed and the Court of Appeals reversed. We granted defendant's petition for discretionary review.

On 16 April 1975, Judge Godwin signed an order dismissing the action as to defendant Leonard Massey, guardian of Earl William Davis, and ordering that Davis be permitted to prosecute this action in his own name.

Other facts necessary to the decision of this case will be discussed in the opinion.

*Attorney General Rufus L. Edmisten by Assistant Attorney General Parks H. Icenhour for plaintiff appellee.*

*Joseph B. Huff for defendant appellant.*

MOORE, Justice.

Defendant Davis's appeal raises two basic questions. First, does G.S. 143-117, which requires "[a]ll persons admitted to Dorothea Dix Hospital . . . to pay the actual cost of their care, treatment, training and maintenance . . . ," apply to persons who were committed to the hospital under the provisions of Article 11, Chapter 122, of the North Carolina General Statutes (as it appeared in the 1964 Replacement Volume and the 1973 Cumulative Supplement to that volume)? Secondly, if so, does

such application comport with the Constitution of the United States and the Constitution of North Carolina?

Defendant first argues that since he was initially committed to Dorothea Dix under Article 11, Chapter 122, of the North Carolina General Statutes, entitled "Mentally Ill Criminals," the State may not collect the sum which it contends is due. Defendant bases this argument upon the contention that Article 11, Chapter 122, of the General Statutes is the sole source of law governing the rights and obligations of those persons who enter State institutions through the criminal justice system, and that the statute (G.S. 143-117) requiring patients to pay for their maintenance applies only to civilly committed patients. Therefore, since there is no provision in Article 11, Chapter 122, requiring one to pay for his maintenance and care, defendant argues that the State is without any right to demand such payments.

We believe that Article 11, Chapter 122, relates primarily to the procedures for committing and discharging persons who, because of their criminal tendencies, are committed to State institutions. We are unable to find any indication that Article 11 was intended to constitute the entire body of law governing persons who enter State institutions by way of the criminal justice system. To the contrary, it would appear that the legislature has intended that all persons entering State institutions, whether voluntarily or involuntarily committed, be required to pay for their confinement to the extent they are able to do so. In pertinent part, G.S. 143-117 provides:

> "*All persons* admitted to Dorothea Dix Hospital . . . are hereby required to pay the actual cost of their care, treatment, training and maintenance at such institutions." (Emphasis added.)

As was said in *State v. LeVien,* 209 A. 2d 97, 101 (N.J. 1965):

> "One whose route to a charitable institution has been tainted by a criminal proceeding occupies neither a unique nor a preferred position. . . . The Legislature did not intend to exempt from liability for maintenance 'criminal' patients while requiring civil patients to bear this financial obligation. Such a result would be illogical and inequitable."

[1] Accordingly, we hold that G.S. 143-117 applies to any person confined to a State institution (as defined in that statute),

regardless of the origin of the commitment. Thus, under our statutes, we hold that defendant may be required to pay the actual cost of his care, treatment, training and maintenance while confined to Dorothea Dix.

Defendant next contends that a person who is involuntarily committed to a mental hospital through the criminal justice system may not be required, under the United States or North Carolina Constitutions, to pay the cost of his treatment and maintenance. He bases this argument upon the premise that a person committed to a mental institution through the criminal justice system is, in all fundamental respects, a prisoner. Thus, by requiring him to pay for his maintenance when prisoners are not required to do so, he is denied the equal protection of the law under the Fourteenth Amendment to the United States Constitution and has been deprived of his property other than by the "law of the land" under Article I, Section 19, of the Constitution of North Carolina. Because of the facts of this case, we will discuss this argument in three parts: (1) the period of confinement between defendant's being found incompetent to stand trial and the time of trial; (2) the period of time between acquittal by reason of insanity and 29 September 1972—the date on which defendant was found to be sane and no longer dangerous to himself or society; and (3) the period of time between 29 September 1972 and 30 November 1973.

[2]  The period of confinement of a defendant in a mental institution between his being declared incompetent to stand trial and the date of trial is essentially for the benefit of the defendant. A defendant so confined has been found incompetent to stand trial because of an inability to effectively assist in his defense or to properly assert his rights at trial. His confinement, while of some benefit to the public, is primarily concerned with restoring a defendant's mental condition to such a state that he will be able to receive a fair trial and fully protect his constitutional rights. A case directly in point on this issue is *In re Estate of Schneider*, 277 N.E. 2d 870 (Ill. 1971), wherein the state sued to collect for the care and maintenance in a state mental hospital of a defendant who had been found incompetent to stand trial. The Illinois Supreme Court held that:

" . . . The proceeding to determine whether one is competent to stand trial is primarily for the protection of his constitutional rights to due process and for his benefit—

not for the protection of the public. The proceeding is distinct and apart from the criminal proceeding. [Citations omitted.]" 277 N.E. 2d at 872. *See also State v. Kosiorek,* 259 A. 2d 151 (Conn. Cir. Ct. 1969) ; *Briskman v. Central State Hospital,* 264 S.W. 2d 270 (Ky. App. 1954) ; *State v. Griffith,* 36 N.E. 2d 489 (Ohio App. 1941).

We find the reasoning stated above to be sound. We hold, therefore, that the State may collect from defendant those amounts which represent the various periods during which defendant was confined between 18 March 1967 (the date on which defendant was deemed incompetent to stand trial) and 7 January 1972 (the date on which defendant was transferred to Madison County for trial).

[3]　With respect to the period of time from defendant's acquittal by reason of insanity to 29 September 1972, we are of the opinion that the State may collect from defendant those amounts representing the "actual cost" of his confinement and treatment. In *In re Boyett,* 136 N.C. 415, 48 S.E. 789 (1904), this Court held that when insanity is proved, it constitutes a total defense to the charges, and that upon a finding of insanity at the time of the commission of the offense, a defendant is entitled to an acquittal. Such a defendant is entitled to be released immediately if it is shown that his mental health has been restored. Otherwise, the defendant is properly committed to an institution for treatment until such time as his mental health has been restored. As was stated in *In re Tew,* 280 N.C. 612, 618, 187 S.E. 2d 13, 17 (1972) : " . . . The commitment of such a person following an acquittal is imposed for the protection of society and the individual confined—not as punishment for crime. [Citations omitted.]" Further, upon acquittal by reason of insanity, a defendant is no longer a "criminal." The jury's verdict has exonerated him from all criminal liability.

The position that a defendant found not guilty by reason of insanity is not a "criminal" and may be required to pay for his maintenance in a mental institution comports with the decisions of other jurisdictions which have passed upon this issue. For example, in *Department of Mental Health v. Pauling,* 265 N.E. 2d 159 (Ill. 1970), defendant was found not guilty of attempted murder by reason of insanity. Pursuant to statute, he was committed to the state mental hospital. The state sued for compensation for defendant's confinement. Defendant ar-

gued, as does defendant in present case, that to require insane persons acquitted of their crimes by reason of insanity to pay for their confinement, while not requiring such payments from prisoners actually convicted, was a denial of the equal protection of the law. The court held that defendants acquitted by reason of insanity were not "criminals" and were not confined as punishment for the commission of a crime. Rather, those persons were confined solely as a result of their insanity, precisely the same reason that a civilly committed person would be confined. Hence, the court held that there was no violation of equal protection in the case and the state could properly recover from the defendant. For other cases permitting such recovery, see *State v. Estate of Burnell,* 439 P. 2d 38 (Colo. 1968) ; *State v. Griffith, supra; Commonwealth v. Evans,* 98 A. 722 (Pa. 1916). We find these decisions dispositive of the case at bar and hold that there is no constitutional impediment to the collection of the sums sought by the State for this period of confinement.

[4]  Several months after defendant was acquitted of murder, he petitioned for a writ of habeas corpus. After a hearing in the matter before Judge Ervin, an order was entered on 29 September 1972 in which it was found as a fact that defendant "has a diagnosis of schizophrenia paranoid type, now in remission. . . . " Although Judge Ervin further found that Davis was "now sane and no longer dangerous either to himself or to society," he refused to order Davis's unconditional release upon a finding that Dr. Rollins of Dorothea Dix Hospital did not recommend such a release. Rather, Davis was granted a "conditional and probationary release" which allowed him to leave the grounds of Dix Hospital between the hours of 6:00 a.m. and 11:00 p.m. for the purpose of "enhancing and facilitating his rehabilitation program."

Defendant insists that his confinement, after Judge Ervin found as a fact that defendant was sane and posed no danger to himself or society, is illegal. Therefore, defendant urges that he may not be required to pay for his care and maintenance subsequent to Judge Ervin's order. The legality of defendant's confinement is not properly before this Court, since defendant did not appeal Judge Ervin's order, and we do not pass upon this contention.

Defendant's situation is, however, remarkably similar to that of the petitioner in *In re Tew, supra.* In *Tew,* petitioner

Hospital v. Davis

had been acquitted of the murder of his wife by reason of insanity. Later, he applied for a writ of habeas corpus. In his order, the judge presiding over the habeas corpus hearing found that "Petitioner has now been restored to his right mind, is now sane, and his mental condition is not now such as to render him dangerous to himself or other persons," and that "Petitioner has had symptoms of paranoia, which are now in remission; and the Superintendent of Dorothea Dix Hospital does not recommend his unconditional release." Upon these findings, the judge ordered a conditional release similar to the one granted to defendant by Judge Ervin in present case. This Court, approving the granting of a conditional probationary release, refused to order Tew's immediate unconditional release and also declined to instruct the trial judge to order Tew's release even if he once again found Tew to be sane and harmless. Tew's paranoia, like that of defendant in instant case, was merely in remission. "The term 'remission' at best means the temporary recovery, perhaps a temporary, partial recovery." *In re Rosenfield*, 157 F. Supp. 18, 22 (D.D.C. 1957). A remission is an "[a]batement of the symptoms and signs of a disorder or disease. The abatement may be partial or complete." Hinsie & Campbell, Psychiatric Dictionary 641 (4th ed. 1970). Under such circumstances, it is for the trial judge, after weighing all the evidence, to decide what relief is appropriate.

On the record before this Court, we are unable to hold that Judge Ervin's order granting a conditional release was without authority, unjustified or otherwise illegal. *In re Tew, supra.* Defendant's paranoia, which had apparently caused him to commit a murder, was not, as a matter of law, fully cured at the time of Judge Ervin's order. It was only temporarily or partially abated. Hence, we are of the opinion that defendant must pay the charges which have accrued since 29 September 1972, as well as the charges incurred before that date.

The position adopted by this Court in the case at bar is in accord with the better reasoned decisions of other jurisdictions that neither persons accused of crime but who are incompetent to stand trial, nor persons acquitted of a crime by reason of insanity are "criminals." Persons in the first class are presumptively innocent. Persons in the second class are conclusively innocent. The confinement of persons to mental institutions both prior to trial and after acquittal by reason of insanity is for the benefit of the patient. The status of such a

person is the same as any other individual who has not been convicted of a crime but who has been committed to a mental institution. We find the cases cited by defendant which hold contrary to the position of this Court to be persuasive but not controlling of the disposition of instant case. *See Ollerton v. Diamenti,* 521 P. 2d 899 (Utah 1974) ; *Robb v. Estate of Brown,* 518 S.W. 2d 729 (Mo. App. 1974) ; *Department of Mental Hygiene v. Hawley,* 379 P. 2d 22 (Cal. 1963).

**[5]**    Defendant further contends that to require him to pay the cost of his confinement would be an unconstitutional deprivation of his property without just compensation. After acquittal by reason of insanity, a former defendant is committed to a state hospital to protect society from an individual who has previously demonstrated a capacity to break the law, and for treatment of that individual to restore his mental health so that he may be returned to society. Such an individual, while not criminally responsible for his actions, may not be released from confinement until his reason is restored and he no longer poses a danger to himself or others. The State has assumed the responsibility of providing care to such persons and the legislature has declared that the State may be permitted to recover the actual cost of such care from all persons receiving it. The patient who is required to pay the "actual cost" of his treatment is, in actuality, paying for services rendered to and received by him. We fail to see how this constitutes a deprivation of property without just compensation. The patient receives treatment in return for his payments. This holding is in line with those cases from other jurisdictions which have decided the issue. *See* Annot., 20 A.L.R. 3d 363 § 10 (1968), for a collection of these decisions.

**[6, 7]**    Defendant further contends that he and other persons committed to mental institutions through the criminal justice system are subject to an unequal tax to support the general welfare. A tax within the meaning of the constitutional prohibition against nonuniformity of taxation is a charge "levied and collected as a contribution to the maintenance of the general government . . . . [It is] imposed upon the citizens in common at regularly recurring periods for the purpose of providing a continuous revenue . . . . " *Tarboro v. Forbes,* 185 N.C. 59, 62, 116 S.E. 81, 82 (1923). *See also Raleigh v. Public School System,* 223 N.C. 316, 26 S.E. 2d 591 (1943). The charges under consideration in present case are not made for the support of

the government, nor are they related to or limited by the necessities of government. They represent the actual cost of the care, treatment and maintenance of a particular patient. *See Kough v. Hoehler,* 109 N.E. 2d 177 (Ill. 1952). It is not unequal or unjust taxation, "nor taxation at all, to require a man to be supported out of his own estate." *In re Yturburru's Estate,* 66 P. 729 (Cal. 1901).

Accordingly, we find no merit in defendant's contentions that the statutes requiring him to pay the actual cost of his care, maintenance, training and treatment during the times pertinent to the case at bar (a) are unconstitutional, under either the United States or North Carolina Constitutions; (b) are a taking of defendant's property without just compensation; or (c) are an improper tax for the general welfare. We conclude that prior to trial defendant was confined for his own benefit in an effort to ensure that he received a fair trial and was able to assist in his defense. Upon being found not guilty by reason of insanity, he was acquitted of all criminal charges arising out of the murder of his wife. In no sense was defendant a "criminal," and his commitment was not based upon any violation of the criminal law. His rights were substantially the same as any other mental patient who had been committed to a State institution, *see Jackson v. Indiana,* 406 U.S. 715, 32 L.Ed. 2d 435, 92 S.Ct. 1845 (1972), and he was free to be released upon restoration of his mental health. The status of such a person is vastly different from the status of a prisoner who is confined for a specified period of time as punishment for a past transgression. The fact that defendant was found to be "sane and not dangerous to himself or others" does not mandate that he be released. The fact that defendant's commitment originated in the criminal justice system has no effect upon his rights. Conversely, the origin of his commitment has no effect upon the obligations arising from his confinement—one of which is to pay for his treatment, if able.

Defendant next contends that G.S. 143-118, -118.1 and -120 are improper delegations of authority by the legislature to the board of trustees or directors of the hospital. He further argues that the statutes deny a patient due process of law in that the patient is not given notice or an opportunity to be heard before the board of trustees on the issues of whether the patient is able to pay for his confinement and whether the

"actual cost" of confinement, as computed under G.S. 143-118, is correct.

[8]   In *Foster v. Medical Care Comm.*, 283 N.C. 110, 195 S.E. 2d 517 (1973), we held that the General Assembly may not delegate its legislative authority to other departments of government or to subordinate administrative agencies. However, once the legislature has declared the policy to be adhered to by the administrative agency; the framework of the law to be followed; and the standards to be used in applying the law, the authority to make factual determinations in applying the law may be delegated to an agency. *See also Watch Co. v. Brand Distributors*, 285 N.C. 467, 206 S.E. 2d 141 (1974) ; *Turnpike Authority v. Pine Island*, 265 N.C. 109, 143 S.E. 2d 319 (1965) ; *Coastal Highway v. Turnpike Authority*, 237 N.C. 52, 74 S.E. 2d 310 (1953).

[9]   In present case, G.S. 143-117 declares the legislative policy that all persons admitted to our State institutions be required to pay for the actual cost of their care, treatment, maintenance and training. G.S. 143-118 sets forth the guidelines to be followed by the board and empowers it to fix the actual cost of maintaining an individual in a State institution. G.S. 143-118.1 and -120 empower the board to make a factual determination of whether a patient (or such other persons as may be legally responsible for the patient) is financially able to pay.

Under the statutes, the General Assembly has clearly stated its policy—that all those who are financially able shall pay for their maintenance. The only determinations to be made by the board are of a factual nature—the "actual cost" of care and who is financially able to pay. The statutes furnish sufficient guidelines to assist in these determinations. Thus, we hold that the General Assembly has properly delegated the powers conferred under G.S. 143-118, -118.1 and -120 to the board of trustees or directors of Dorothea Dix Hospital.

[10]   Finally, defendant contends he has been denied due process on the ground that he should be entitled to an administrative hearing in which he can present evidence and otherwise challenge the determination of the hospital board as to the proper charge to be assessed for his care, treatment and custody.

" 'The law of the land' and 'due process of law' provisions of the North Carolina and U. S. Constitutions require

notice and an opportunity to be heard before a citizen may be deprived of his property. [Citations omitted.]" *McMillan v. Robeson County,* 262 N.C. 413, 417, 137 S.E. 2d 105, 108 (1964).

Further, as was stated by the United States Supreme Court in *Phillips v. Commissioner,* 283 U.S. 589, 596-97, 75 L.Ed. 1289, 1297, 51 S.Ct. 608, 611 (1931): "Where only property rights are involved, mere postponement of the judicial inquiry is not a denial of due process, if the opportunity given for the ultimate judicial determination of liability is adequate. [Citations omitted.]" *See also Mitchell v. W. T. Grant Co.,* 416 U.S. 600, 40 L.Ed. 2d 406, 94 S.Ct. 1895 (1974); *Ewing v. Mytinger and Casselberry, Inc.,* 339 U.S. 594, 94 L.Ed. 1088, 70 S.Ct. 870 (1950).

In instant case, defendant was given an opportunity to contest the board's determination of the "actual cost" of his confinement and an opportunity to contest the board's finding that he was financially able to pay. Defendant could have specifically raised these issues in his answer to plaintiff's complaint by way of a denial, or as an affirmative defense, or in some other manner through which the issue would be placed before the trial court. This he did not do. Defendant was thus given the opportunity to be heard on any and all issues raised by plaintiff's complaint and to have a judicial determination of his liability prior to his being required to pay the amounts alleged to be due. This is a sufficient judicial inquiry into the matter to satisfy due process of law and to obviate the necessity of a hearing before the board of trustees or directors of the hospital. Hence, we find no merit in defendant's contention that he was entitled to an administrative hearing or that he was denied due process.

Since defendant offered no evidence contesting the determination of "actual cost" under G.S. 143-118, we do not pass upon the constitutionality of the apparent restrictions on admissible evidence contained in the statute.

For the reasons stated, the decision of the Court of Appeals is affirmed and this action is remanded to that court with direction that it remand to the Superior Court of Wake County with instruction that the summary judgment in favor of defendant entered on 30 December 1974 be vacated.

Affirmed.