STATE OF CONNECTICUT *v.* JOSEPH KOSIOREK, JR.

APPELLATE DIVISION OF THE CIRCUIT COURT

FILE NO. CV 12-6512-6788

Argued February 24—decided March 28, 1969

*Ronald Cassidento,* of Hartford, for the appellant (defendant).

*Edward J. Peters, Jr.,* assistant attorney general, for the appellee (plaintiff).

Jacobs, J. This action was brought by the state through its commissioner of welfare against the defendant as representative payee of his father, an inmate confined in a state institution, for reimbursement of sums expended by the state on behalf of the inmate.

The allegations of the complaint may be briefly summarized as follows: On February 15, 1955, Joseph Kosiorek, Sr., was committed to the Connecticut Valley Hospital, a state institution for mental illness, under § 8748 of the 1949 Revision; since November, 1960, the defendant has been drawing social security benefits as representative payee of the inmate; and the state has been billing the defendant as such representative payee since December 1, 1960, at the rate of $22.78 a week. The state claims there is due and owing it, as of the date of the writ, the sum of $5546.56, which the defendant has refused and failed to pay.

The defendant filed a general denial and five special defenses. These defenses fall into three main categories: (1) Section 8748 as amended by Public Acts 1959, No. 523, § 2 (now, as amended, General Statutes § 54-40) does not apply to persons committed prior to the effective date of the 1959 amendment, and any other construction would be ex post facto; (2) § 54-40 unreasonably and arbitrarily places the burden of support of a criminal defendant awaiting trial on a restricted class, that is, on the estate of the incompetent and his relatives without due process of law; and (3) § 54-40 imposes burdens on those persons not charged with or in any way connected with criminal activity. The trial court sustained the plaintiff's demurrer to the special defenses. The appeal challenges the correctness of that adjudication.

The criminal offense charged against the incompetent accused does not appear, nor is it material on this appeal. There is nothing in the record before us to show that an attack had been made on the validity or propriety of the commitment proceedings. We do know from the pleadings that the inmate was committed to the Connecticut Valley

Hospital on February 15, 1955, under § 8748 of the 1949 Revision, which, in pertinent part, provided that if an "accused is not able to understand the proceedings [against him] because he is insane or mentally defective, . . . [the court] shall commit him to one of the state hospitals for mental illness in this state, for confinement, support and treatment until the time of his trial." The state has assumed and borne the expense of support of this inmate for nearly six years. The act under which the incompetent accused was committed was amended by Public Acts 1959, No. 523, § 2, and it now appears, as further amended by Public Acts 1967, No. 670, as § 54-40 of the General Statutes. The 1959 amendatory act deleted the word "support" following the word "confinement" and added the following sentence: "Such person's hospital expense during such confinement shall be computed and paid for in the same manner as is provided for persons committed by a probate court under the provisions of chapter 308."

The inmate here is not a convict as that term has generally been defined; see *Quintard* v. *Knoedler,* 53 Conn. 485, 487; *Molineux* v. *Collins,* 177 N.Y. 395, 398, 18 C.J.S., Convicts, § 1; nor is this commitment in the nature of a penalty. See *Dubois, petitioner,* 331 Mass. 575, 578. His commitment to a state hospital does not expiate the crime with which he was charged; and the fact that his sanity may be restored and he may then be returned to the court in which the criminal charge is pending is of no significance. Therefore, it cannot be successfully urged that the inmate is serving any sentence. No part of the period during which he was an inmate of the state hospital can in any way be related to any sentence for crime nor to any detention by reason of the alleged commission of any crime. If, on the other hand, an inmate of a state hospital may

be said to be in a penal or correctional institution, then, of course, the state would be responsible for his support. But we can find no hypothesis on which such a claim may be made. Neither the nature of his confinement nor his relation to the state under it was different from that of an insane person committed by a probate court. Thus, we regard the inmate's commitment under what is now § 54-40 as identical with the legal effect of a civil commitment by a probate court. The only difference is that in the present case if the inmate is restored to sanity the law requires that he stand trial; if he is not restored to sanity, his commitment operates in all particulars as a civil commitment by a probate court. That difference, as we have pointed out, is of no significance.[2]

When, therefore, this inmate was "criminally committed" under what is now § 54-40, the state entered into no contract relation with him. "It simply acts of its own volition, in response to the dictates of humanity, in the performance of a governmental duty now recognized as resting upon a modern State and for the good of the individual concerned. There not only is no promise on the part of the State to the unfortunate or his personal representative, but no legal consideration for one. The burden which the State assumes and bears is assumed and borne as its purely voluntary undertaking, and not as a result of a contract obligation to that end entered into with him or other person representing him." *State* v. *Romme*, 93 Conn. 571, 573. "One whose route to a charitable institution has been tainted by

---

[2] The defendant's reliance on *State* v. *Frink*, 14 Conn. Sup. 33, is misplaced. That case was decided in 1946—long before the 1959 amendment to § 8748 of the 1949 Revision was enacted. In the *Frink* case, the state was bound by the statute as it then existed (Rev. 1930 § 6431, as amended by Cum. Sup. 1935 § 1722c) to bear the support of the inmate while he was confined in a state institution.

a criminal proceeding occupies neither a unique nor a preferred position. The concept of forcible detention so obviously present in the case of one subjected to a criminal proceeding applies equally to a patient not similarly experienced. The Legislature did not intend to exempt from liability for maintenance 'criminal' patients while requiring civil patients to bear this financial obligation. . . . No one contends that the State should not support a needy patient whether criminally or civilly committed.[3] But neither should the State nor its taxpayers be burdened with the cost of maintaining one who is financially able to pay." *State* v. *LeVien,* 44 N.J. 323, 331; see *State* v. *Martin,* 140 Conn. 21, 23.

When, therefore, the law turns to an inmate's assets for help, if he is able to give it, it does so only to supplement the public responsibility. It is not unreasonable, it is not arbitrary, it is not a denial of due process, for the law to attach an enforceable obligation upon the inmate's assets. And contrary to the defendant's contentions, we find no provision in the federal or state constitution which prohibits the act in question. Nor is there a provision in our constitution which can restrain the legislature from passing retrospective laws; it is its practice periodically to do so, and not infrequently it passes acts which affect antecedent vested rights. See *Welch* v. *Wadsworth,* 30 Conn. 149, 155; *State* v. *Romme,* supra.

Nor is the act in question ex post facto. "An act *ex post facto* relates to *crimes* only; it is, emphatically, the making of an innocent action criminal; and the expression is never applicable to a law creating a civil obligation." *Bridgeport* v. *Hubbell,* 5 Conn. 237, 240. " 'At an early day it was settled by

---

[3] Connecticut Valley Hospital is more than ample evidence of state assumption of such responsibility.

authoritative decision, in opposition to what might seem the more natural and obvious meaning of the term *ex post facto,* that in their scope and purpose these provisions were confined to laws respecting criminal punishments, and had no relation whatever to retrospective legislation of any other description. And it has, therefore, been repeatedly held that retrospective laws, when not of a criminal nature, do not come in conflict with the National Constitution, unless obnoxious to its provisions on other grounds than their retrospective character.' " *Bankers Trust Co.* v. *Blodgett,* 96 Conn. 361, 367; see *Calder* v. *Bull,* 3 U.S. (3 Dall.) 386, 390, quoted with approval in *State* v. *Hoyt,* 47 Conn. 518, 532.

The language of the amendatory act is too definite and certain in its meaning to admit of any doubt. Its purpose is equally clear; it is to relieve the state of the burden of support of the inmate and to place that burden on the recipient or his estate or both. See General Statutes § 17-298. It is a general law and of uniform operation. "The reasoning back of the provision imposing the unconditional and direct liability on such a person's estate is obvious. It is only just that public funds be made good for amounts expended on a person's behalf before his heirs or next of kin receive anything from the estate." *State* v. *Martin,* supra, 23. "[I]t is not necessary to extend charity to those who are able to support themselves; indeed, it would be unreasonable to do so." *Estate of Yturburru,* 134 Cal. 567, 569.

The statute in question does not come within any inhibition of the constitution against discriminatory and unlawful classification. We hold, moreover, that it was a valid exercise of the discretion vested in the legislature to make no distinction between those persons committed under § 54-40 and those

committed under conventional civil commitments by a probate court. See *Kaiser* v. *State,* 80 Kan. 364; *Briskman* v. *Central State Hospital,* 264 S.W.2d 270 (Ky.); *State* v. *LeVien,* 44 N.J. 323; *State ex rel. Bricker* v. *Griffith,* 34 Ohio L. Abs. 95; *Rice* v. *State,* 14 Ohio App. 9; *McKenna* v. *Roberts County,* 72 S.D. 250; *State* v. *Ikey's Estate,* 84 Vt. 363; cf. *Kough* v. *Hoehler,* 413 Ill. 409; *Department of Mental Hygiene* v. *Kirchner,* 60 Cal. 2d 716, vacated on other grounds and remanded, 380 U.S. 194, on remand, 62 Cal. 2d 586; *Department of Mental Hygiene* v. *Hawley,* 59 Cal. 2d 247;[4] note, 20 A.L.R.3d 363, 368.

Moneys paid to the defendant as the representative payee belong to the beneficiary. 42 U.S.C. § 405 (j); see 20 C.F.R. §§ 404.1601—404.1610; *Miller* v. *Shapiro,* 4 Conn. Cir. Ct. 63, 66. The representative payee is held to accountability for the payments made to him on behalf of the beneficiary. 20 C.F.R. § 404.1609. Payments made to the representative payee must be used "only for the use and benefit of such beneficiary . . . [and] in the beneficiary's best interest." 20 C.F.R. § 404.1603. "Where a beneficiary is confined in a . . . State . . . institution because of mental or physical incapacity, the relative . . . to whom payments are certified on behalf of the beneficiary shall give highest priority to expenditure of the payments for the current maintenance needs of the beneficiary, including the customary charges made by the insti-

---

[4] In *Department of Mental Hygiene* v. *Hawley,* 59 Cal. 2d 247, also relied upon by the defendant, the court held (p. 255): "The enactment and administration of laws providing for sequestration and treatment of persons in appropriate state institutions—subject of course, to the constitutional guaranties—who would endanger themselves or others if at large is a proper state function; being so, it follows that the expense of providing, operating and maintaining such institutions should (subject to reasonable exceptions *against the inmate or his estate)* be borne by the state." (Italics supplied.)

tution . . . in providing care and maintenance. It is considered in the best interests of the beneficiary for the . . . person to whom payments are certified on the beneficiary's behalf to allocate expenditure of the payments so certified in a manner which will facilitate the beneficiary's earliest possible rehabilitation or release from the institution or which otherwise will help him live as normal a life as practicable in the institutional environment." 20 C.F.R. § 404.1606.

This is not a case where relatives of the inmate are stripped of their assets in order to reimburse the state for support of the inmate; quite to the contrary, the state is seeking reimbursements out of the beneficiary's assets. Under § 17-295 (c), the defendant, as the representative payee of social security benefits of the beneficiary, is made responsible for the support of the patient "in accordance with the amount of the patient's estate or the benefits received, or both, as the case may be." The state's objective is merely to compel the defendant in his representative capacity to comply with the statutes and the social security laws.

Since we find no constitutional or statutory infirmity in the challenged legislation, the court correctly and properly sustained the demurrer.

There is no error.

In this opinion KOSICKI and STAPLETON, Js., concurred.